UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RODNEY EPPS, on behalf of themselves and
others similarly situated, JOHN BROOKS, on
behalf of themselves and others similarly
situated, COREY WILSON, on behalf of
themselves and others similarly situated,
JOSEPH BUCKS, SR., on behalf of
themselves and others similarly situated,
LYNDON HART, on behalf of themselves and
others similarly situated, JAWANA MORRIS,
on behalf of themselves and others similarly
situated,

                Plaintiffs,

v.                                   Case No.  5:04-cv-46-Oc-10GRJ

OAK STREET MORTGAGE LLC,

                Defendant.
_____

## REPORT AND RECOMMENDATION[1]

      Pending before the Court is Defendant's Motion For Decertification. (Doc. 103.)

Defendant filed a supporting memorandum (Doc. 121), numerous depositions (Docs.

104-120), and supplemental filings (Docs. 128 & 134).  Plaintiffs filed a response in

opposition (Doc. 125), a supporting memorandum (Doc. 126) and supplemental filings.

(Docs. 129 & 133.)  For the reasons discussed below, it is respectfully recommended

that Defendant's Motion For Decertification (Doc. 103) should be **GRANTED** to the

extent detailed in this Report and Recommendation and otherwise **DENIED**.

---

[1]Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local
Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely
objections shall bar the party from a *de novo* determination by a district judge and from attacking factual
findings on appeal.

## I. **Background**

Plaintiffs, who were loan officers for Oak Street Mortgage LLC ("Oak Street)[2]

filed this action under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§207

and 216(b), to recover unpaid overtime compensation allegedly owed to them and all

similarly situated persons who are and/or were employed by Oak Street as loan

officers.[3]

On April 9, 2004, Plaintiffs filed a motion to facilitate notice (Doc. 24), seeking to

conditionally certify a class of loan officers, who worked at all thirty of Oak Street's

offices after February 2, 2001.  The Court granted conditional certification but limited the

class to:

> All loan officers employed by Oak Street Mortgage, LLC, at one of its
> branch offices located in Greenville, South Carolina; Atlanta, Georgia; St.
> Petersburg, Florida; or Ocala, Florida, and who worked in excess of forty
> (40) hours in any one workweek between February 2, 2001 and the
> present and who were not paid overtime rates as specified by law.

Doc. 68.

After appropriate notice was sent to all potential class members thirty-eight loan

officers subsequently have opted-in as plaintiffs (hereinafter "opt-in Plaintiffs").[4]

---

[2] Rodney Epps and John Brooks worked in the Ocala office.  See Doc. 113 (Deposition of Rodney Epps), pages 17, 19; Doc. 126 (Deposition of John Brooks), pages 20-21.  Joseph Bucks, Sr. worked in the St. Petersburg office.  See Doc. 107 (Deposition of Joseph Bucks, Sr.), page 16.  Lyndon Hart and Jawana Morris worked in the Atlanta office.  See Doc. 118 (Deposition of Lyndon Hart), pages 6, 24; Doc. 108 (Deposition of Jawana Morris), pages 7-8, 15.  Plaintiff Corey Wilson dismissed without prejudice his claims against Oak Street Mortgage.  See Doc. 76.

[3] See Doc. 1 (Plaintiffs' Complaint), ¶3.

[4] Section 216(b) class actions differ from Rule 23, Fed.R.Civ.P. class actions in that, under §216(b), a person who wishes to join the collective action must affirmatively "opt-in" by filing written consent with the court.  Under Rule 23, a person must affirmatively "opt-out" if he or she wishes to abstain from the lawsuit.

(continued…)

Pursuant to authorization from the Court, the parties engaged in extensive collective action discovery.[5]  The Plaintiffs and opt-in Plaintiffs propounded eleven sets of interrogatories, twenty-one requests for production, one set of requests for admissions and conducted seven depositions, including a deposition of a corporate representative.[6]  Oak Street propounded eight sets of interrogatories and seventeen requests for production and deposed ten Plaintiffs and opt-in Plaintiffs.[7]  Based on the collective action discovery, Oak Street filed its Motion For Decertification (Doc. 103) and Plaintiffs filed a response in opposition. (Docs. 125 & 126.)

On January 31, 2005, Plaintiffs' counsel filed a related lawsuit in the Jacksonville Division -- *Vaughn et al., v. Oak Street Mortgage, LLC*, *Case No. 5:05-cv-311-Oc-10GRJ* (the "*Vaughn Case*").  *Vaughn* contains virtually identical claims to those in this case; the only difference is that the plaintiffs in *Vaughn* are employed in Oak Street's Jacksonville office.  Because the two cases are related, *Vaughn* was transferred to the Ocala Division on June 30, 2005.[8]

On July 20, 2005, the Court conducted a hearing in *Vaughn*.  At the hearing, Plaintiffs ' counsel suggested that they intended to request nationwide certification in

---

[4](…continued)
<u>See</u> 29 U.S.C. §216(b); <u>see also</u> <u>Hipp v. Liberty National Life Insur. Co.</u>, 252 F.3d 1208, 1216 (11th Cir. 2001).

[5] The Court adopted a two-stage discovery plan -- the first to conduct discovery relevant to determining whether the case should progress as a collective action ("collective action discovery"), and the second to conduct discovery relevant to the merits of Plaintiffs' case ("merits discovery").  <u>See</u> Doc. 62.  The Court gave the parties more than seven months to conduct the collective action discovery.  <u>See</u> <u>id</u>.

[6] <u>See</u> Doc. 103 at ¶6; Doc. 125 at ¶3.

[7] <u>See</u> <u>id</u>.

[8] <u>See</u> Doc. 25 in *Vaughn.*

*Vaughn*.  Because of the similarity of this case and *Vaughn,* in order to promote judicial economy and efficiency in addressing the issue of class certification, and in order to provide Plaintiffs' counsel with a full and fair opportunity to present its arguments in opposition to Oak Street's request for decertification and in support of Plaintiffs' arguments for nationwide certification, the Court granted Plaintiffs the right to file supplemental briefing, with supporting evidence, in this case so that the Court could fully address the issue of whether to decertify the limited class in this case, permit the class to remain as conditionally certified or grant nationwide certification. [9]  Plaintiffs have taken the Court's invitation and filed a supplemental memorandum (Doc. 133) and Oak Street has filed a response. (Doc. 134.)

## II. **DISCUSSION**

### A.    **Motion for Decertification**

### **Legal Standard**

To maintain a collective action, Plaintiffs must demonstrate that they are "similarly situated" to the opt-in Plaintiffs with respect to their job requirements and with regard to their pay provisions.[10]  Plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative class members."[11]

---

[9] See Doc. 132.  The Court also stayed all deadlines in *Vaughn* until the Court issues its ruling on the motion for decertification in this case. See Doc. 43 in *Vaughn*. After the Court stayed all deadlines, Plaintiffs filed a Motion for Conditional Class Certification, Judicial Notice and Production of List (Doc. 47 in *Vaughn*).  The Court stayed the deadline for Oak Street to respond to the motion until the Court has ruled on Plaintiff's Motion for Decertification in this case.  See Doc. 53 in *Vaughn*.

[10] See Dybach v. State of Fla. Dept. of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991).

[11] Hipp v. Liberty National Life Insur. Co., 252 F.3d 1208, 1217 (11th Cir. 2001)(quoting Grayson v. K-Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996).

The Eleventh Circuit has recommended a two-staged approach.[12]  At the first stage (typically in response to a motion to conditionally certify made prior to discovery) the court utilizes a "fairly lenient" standard in light of the limited evidence then available.[13]  The second stage usually occurs at the end of discovery upon the defendant's motion for decertification of the class.[14]  Because the Court has already utilized the "fairly lenient" standard when it granted conditional certification and the parties have engaged in extensive collective action discovery, the Court will consider the similarly situated issue at the second stage -- i.e., it will make a factual determination based on the record produced through discovery.[15]

If the Court determines that the Plaintiffs and opt-in Plaintiffs are similarly situated, then they will proceed to trial collectively.[16]  If on the other hand, the Court finds that the Plaintiffs and opt-in Plaintiffs are not similarly situated, the class will be decertified, the opt-in Plaintiffs will be dismissed without prejudice and the original Plaintiffs will proceed to trial on their individual claims.[17]

### Similarly Situated Analysis

Based on the evidence produced through discovery, Oak Street argues that decertification is required based on the differences between the Plaintiffs and the opt-in

---

[12] See Hipp, 252 F.3d at 1218-19.

[13] See Cameron-Grant v. Maxim Healthcare Services, Inc., 347 F.3d 1240, 1243 n.1 (11th Cir. 2003); Hipp, 252 F.3d at 1217-18.

[14] See Hipp, 252 F.3d at 1218.

[15] See Hipp, 252 F.3d at 1218.

[16] See Mooney v. Aramco Services Co., 54 F.3d 1207, 1214 (5th Cir. 1995).

[17] See id.

Plaintiffs.  Conversely, Plaintiffs argue that this action should move forward as a collective action because the Plaintiffs are similarly situated to the opt-in Plaintiffs.  The parties identify numerous similarities and differences which the Court will now consider.

The Plaintiffs and opt-in Plaintiffs worked as loan officers in four of Oak Street's branch offices -- i.e., Atlanta, Georgia; Greenville, South Carolina; Ocala, Florida; and St. Petersburg, Florida.  The four branch offices were all located in the Southeast/Dietz region, which at all times relevant to this lawsuit was managed by Michael Dietz.[18]  Each of the branch offices was managed by a site manager.[19]

The loan officers in all four offices held the same job title and shared the same corporate-sponsored job description.[20]  They also performed the same basic job functions.[21]  Simply stated, the job of the loan officers involved contacting Oak Street's potential customers and offering them different financing options, taking applications from the potential customers, receiving initial documentation for the loans, packaging the documentation and sending it to underwriting for review, and then if the loan was

---

[18]  Dietz was regional manager from October 23, 2000 through September 2004.  See Doc. 111 (Deposition of Michael Dietz), page 19.  During the relevant time period, Oak Street's branch offices were divided among six regions -- the East Region, the West Region, the Midwest Region, the Southeast/Cowan Region, the Southeast/Dietz Region, and the Great Western/Southwest Region.  See Doc. 40, Exhibit 1 (Declaration of Jean Beaver), ¶5.

[19]  Oak Street points out that the site managers in Atlanta, Greenville and St. Petersburg reported directly to Michael Dietz, while the site manager in Ocala reported to Nick Garman, who in turn reported directly to Michael Dietz.  See Doc. 103, ¶36.  However, Oak Street has not identified any differences resulting from the variation in reporting structure.  Accordingly, it is a difference without significance.

[20]  See Doc. 125, Exhibit A; Deposition of Michael Dietz, pages 69-70, 73, 169, Exhibits 11 & 12; Doc. 104 (Deposition of Jean Beaver), page 145; Doc. 106 (Deposition of Glenn Brunker), page 202.

[21]  Other than arguing that loan officers had discretion, Oak Street does not specifically argue that job duties varied by office or loan officer.  However, Oak Street does note that the Atlanta, St. Petersburg, and occasionally the Greenville offices sold alternative (i.e., non-Oak Street) products while the Ocala office did not.  See Doc. 103, Exhibit C, Response to Interrogatory #5.  This slight variation in duties has little, if any, impact on the similarly situated analysis.

ready to close, pre-closing the loan with the customer (i.e., making sure that the customer understands the facts and figures.)[22]  The job duties for loan officers did not change during the period relevant to this lawsuit.[23]

Oak Street argues that the Plaintiffs and opt-in Plaintiffs carried out their duties differently, "exercising a great deal of discretion."[24]  To support this contention, Oak Street quotes two excerpts from the deposition of Michael Dietz.  In the first excerpt, Dietz testified that Oak Street's pricing engine would reach different results based on the information put into the pricing engine by the loan officer.  In the second excerpt, Dietz testified that loan officers dictated the "points" on a loan.  Oak Street also cites to Jean Beaver's Declaration in which she states that loan officers exercise "considerable discretion in their jobs" including: collecting and analyzing information regarding potential customers' income, assets, investments or debts; determining which financial products best meet the potential customers' needs and financial circumstances;

---

[22] See Deposition of Glenn Brunker, pages 203-04.  More specifically, plaintiffs identify the following job duties in their papers: (a) selling Oak Street products and offering potential customers Oak Street's financing options; (b) receiving leads from Oak Street's marketing department, calling those leads and obtaining information; (c) taking information from the potential customer using a form provided by Oak Street and inputting the information into Oak Street's computer system; (d) obtaining permission to pull credit report and pulling the credit report generated by Oak Street's computer system/software; (e) preparing a proposal for the customer that matched the customer's needs to Oak Street's uniform product guidelines; (f) using Oak Street's product matrix in making proposals and determining which products suited particular customers; (g) determining mortgage rates based on Oak Street's computer programs/policies; (h) utilizing Oak Street's pricing engine, which assigns an interest rate based upon points and the information the loan officer inputs in the system; (i) assigning a product for the customer based on the grade generated by the product matrix; (j) obtaining documents from the customer and preparing a submission package for review by his or her supervisor; and if underwriting approves the loan (k), reviewing details of the loan with customer using the pre-closed checklist prepared by Oak Street's loan processing department.

[23] See Deposition of Glenn Brunker, page 202; Deposition of Michael Dietz, page 169.  In response to Interrogatories, Oak Street identified one difference between the job duties of exempt and non-exempt loan officers -- that exempt loan officers were required to maintain contact logs, but now only new loan officers and loan officers with performance problems are required to maintain contact logs.  See Doc. 103, Exhibit C, Response to Interrogatory #5.  This distinction is not significant to the similarly situated analysis.

[24] See Doc. 103, ¶43.

advising the potential customers about the potential advantages and disadvantages of Oak Street's different financial products; and marketing, servicing and promoting Oak Street's financial products.[25]  Even assuming that loan officers exercise such discretion,[26] Oak Street has failed to point to any evidence showing that the degree of discretion varied by loan officer or location.  Rather, the evidence suggests that the loan officers exercised the same degree of discretion regardless of loan officer or location.[27]

Loan officers in all four branch offices were required to close three loans per month.[28]  Oak Street established a weekly production goal of ten proposals and two submissions (known as "10/2").[29]  While Dietz testified that 10/2 was used (to some extent) by all four branch offices,[30] Oak Street points to record evidence purportedly showing that the site managers at each office implemented their own performance standards to ensure that the loan officers closed three loans per month.[31]  However,

---

[25] See Doc. 40, Exhibit 1 (Declaration of Jean Beaver in Support of Defendant's Opposition to Plaintiff's Motion to Facilitate Notice), ¶9.

[26] Plaintiffs disagree and have identified numerous ways in which loan officers in all four offices shared "significantly limited discretion, independent judgment and decision-making."  See Doc. 125, ¶12.

[27] While the extent of the loan officers discretion will likely be considered in determining whether loan officers were properly classified as exempt prior to January 2003,  the Court need not resolve that issue at this juncture; rather the Court's inquiry is limited to whether the Plaintiffs and opt-in Plaintiffs are similarly situated.

[28] See Deposition of Michael Dietz, pages 90, 122; Deposition of Glenn Brunker, pages 75-76.

[29] See Deposition of Michael Dietz, pages 115-18; Exhibits 22, 28, 32, 36; Deposition of Joe Gregoire, page 65; Deposition of Glenn Brunker, page 79; Doc. 117 (Deposition of Kelton Graham), pages 35-36, 87.

[30] See Deposition of Michael Dietz, pages 115-18.

[31] According to Oak Street, the Ocala site manager, Joe Gregoire, initially complied with 10/2 but then modified the 10/2 standard by dropping the proposal requirement and lowering the submission requirement to one and one-half.  However, this modification was made at some point in 2004 and the last date that any Plaintiff or opt-in Plaintiff worked in the Ocala office was in December 2003.  See Doc. 119

(continued…)

even if the site managers implemented different performance standards, the differences are not significant to the similarly situated analysis.[32]  Moreover, several Plaintiffs and opt-in Plaintiffs have testified that it was very difficult to meet these production goals during a 40-hour week.[33]

---

[31](…continued)
(Deposition of Joe Gregoire), pages 156-57(testifying that loan officers were required to comply with 10/2 until approximately 90 days before his deposition, which was taken on December 15, 2004); Doc. 134, Exhibit C to Declaration of Dena Brawner.

Oak Street contends that the Atlanta office did not require its loan officers to comply with 10/2 until 2003.  However, Oak Street acknowledges that the testimony is conflicting as to when 10/2 was implemented.  See Doc. 112 (Deposition of Lisa Terrell), pages 35, 122-26 (testifying that 10/2 was not required until 2003); Doc. 120 (Deposition of David Ichay), pages 62, 80 (testifying that 10/2 was required as early as 2002).

Oak Street asserts that the St. Petersburg site manager, Chris Woods, initially required his loan officers to generate ten loan proposals and three submissions, but later reduced the requirement to two submissions and then beginning in March 2003 lowered the submission requirement to one and one half.  The record is unclear as to whether three submissions were required during the period relevant to this action.  See Doc. 116 (Deposition of Chris Woods), pages 74-76 (testifying that he required three submissions when he started in November 2000 but at some point reduced that requirement to two submissions).  While there is some evidence that the submissions requirement was reduced to one and one half (see id., page 160 & Exhibit 4), Woods testified that two submissions is still the standard today.  See id., page 76.

Finally, as to Greenville, Oak Street contends that the site manager, Kelton Graham, initially required his loan officers to close four loans but has since lowered this requirement to three loans, and that he sets daily goals and requirements.  Graham testified that he required his loan officers to comply with 10/2.  See Deposition of Kelton Graham, pages 35-36, 87.  Graham further testified that pursuant to direction from Dietz or other Oak Street management he also required his loan officers to generate three proposals and to place 100 outbound telephone calls per day.  See id., pages 35-36, 57-58, 87.  With respect to setting daily revenue goals, Graham testified that one day he set an office-wide goal of three submissions for that day -- i.e., a total of three submissions by the entire office staff.  See id., pages 147-49 & Exhibit 1.

[32] Oak Street also points out that the amount of revenue that each loan officer was supposed to generate varied by location.  By way of example, in 2004, the average monthly revenue goal was $339,332 for loan officers in Ocala; $313.042 for loan officers in Atlanta; $304,559 for loan officers in Greenville; and $316,992 for loan officers in St. Petersburg.  See Doc. 103, ¶30. This difference is not significant to the similarly situated analysis.

[33] See e.g., Doc. 109 (Deposition of James Perry), page 91-92; Deposition of Lyndon Hart, pages 56, 71-72; Deposition of Lisa Terrell, page 145-46.

Loan officers in all four offices were evaluated using a loan officer evaluation form.[34]  The evaluation focused in part on whether loan officers met their production requirements.[35]  If loan officers (or managers) in any of the four offices failed to meet their production requirements, they were subject to the "Performance Improvement Plan" ("PIP") -- a four-step process that included warnings and ultimately termination.[36]  There is evidence that loan officers were reminded that failure to meet production requirements could result in termination.[37]  Indeed, numerous loan officers were disciplined or terminated for failing to meet production requirements.[38]

Dietz reviewed the production at all four offices on a weekly and monthly basis.[39]  On numerous occasions Dietz emailed the managers and loan officers regarding their production and directing (or recommending) how production could be improved.[40]  The evidence shows that Brunker (to some degree) oversaw the production of Dietz's

_____

[34] See Deposition of Michael Dietz, page 202.

[35] See id., pages 202-03.

[36] See id. pages 94-95, 124.

[37] See e.g., Deposition of Lyndon Hart, pages 73-74.

[38] See e.g., Doc. 125, Exhibit G; Deposition of Kelton Graham, pages 100-01.

[39] See Deposition of Michael Dietz, pages 129-30; Deposition of Chris Woods, page 20; Deposition of Nick Garman, page 151 & Exhibit 2; Deposition of Kelton Graham, page 38; Deposition of Joe Gregoire, page 25.

[40] See e.g., Doc. 125, Exhibit C; Deposition of Michael Dietz, pages 129-32, 182, 247-48, 254-55, 274-75 & Exhibits 22, 29, 30, 32, 41, 45, 55.

branch offices.[41]  The evidence also shows that site managers and sales managers at all four branch offices were disciplined or terminated for low production.[42]

The compensation plan for all four branch offices included a commission plan and a base pay structure.[43]  Before January 2003, loan officers were paid an annual salary and from January 2003 they were paid an hourly wage.[44]  Oak Street points out two differences.  First, as a general rule, the base pay was higher in Greenville and Atlanta than in Ocala and St. Petersburg.[45]  Second, for a period of time, loan officer commissions were determined by monthly loan volume in Ocala and St. Petersburg while commissions were determined by front-end fee revenue in Atlanta and Greenville.[46]  However, beginning in March 2003, commissions in all four offices were determined by front-end fee revenue.[47]

---

[41]  See e.g., Deposition of Glenn Brunker, pages 68-69, 101 & Exhibit 11.

[42]  See e.g., Deposition of Michael Dietz, pages 34-35, 283, 303-04 & Exhibits 5, 62, 69, 72, 75; Deposition of Chris Woods, pages 139-43.

[43]  See Deposition of Glenn Brunker, pages 38, 43.  Loan officers were also eligible to participate in Oak Street's wealth builder program, site-specific, region-wide and company-wide contests, and qualify for trips.  See Deposition of Michael Dietz, pages 328-29; Deposition of Jean Beaver, page 160.

[44]  See Doc. 134, Exhibit C to Declaration of Dena Brawner.

[45]  See Deposition of Michael Dietz, page 121. Oak Street notes that following the acquisition of the Ocala and St. Petersburg offices (which were previously affiliated with AABCO) Oak Street maintained many of AABCO's policies and procedures. See Doc. 103 at ¶35.  However, the only example identified by Oak Street was that it made no immediate attempt to bring Ocala and St. Petersburg salaries and commissions in line with Oak Street salaries and commissions. See id.

[46]  See Doc. 103, Exhibit E.

[47]  See id.

The site managers at each branch office were responsible for setting the hours for their loan officers.  The hours varied by office and in some cases by loan officer.[48]  However, Dietz and other upper-level management directed the site managers to schedule at least one late night per week until 8:00 p.m. and require any loan officers who did not meet their weekly performance requirements to work on Saturday.[49]  In addition, loan officers in all four offices were required to attend "Super Saturdays" which were company-wide and region-wide outbound calling blitzes.[50]

Notably, during the relevant time period involved in this case, Oak Street had two different overtime policies.[51]  From February 2001 to January 2003, Oak Street classified its loan officers as exempt, and consequently, they were not paid for any overtime they worked.[52] During this period, loan officers were not required to keep time sheets.[53]  The loan officers, who were classified as exempt, contend that they were required to work more than forty hours per week and that they were not paid overtime compensation.

---

[48] See Doc. 103, ¶36(a)-(d).

[49] See Deposition of Glenn Brunker, pages 103-06, Exhibit 18; Deposition of Lyndon Hart, page 56; Deposition of Joe Gregoire, Exhibit 14.

[50] See Deposition of Michael Dietz, pages 194-95, 207-08 & Exhibit 31; Deposition of Glenn Brunker, pages 64-65, 103-06.  For example, in 2002, the Southeast/Dietz region had one "Super Saturday" per month and the dates were the same for all of the branch offices.  See Deposition of Joe Gregoire, Exhibit 1.

[51] See Doc. 103, Exhibit C (Defendant's Response to Lyndon Hart's First Set Of Interrogatories), Answer to Interrogatory #5.

[52] See id

[53] See id.

In January 2003, Oak Street reclassified its loan officers as non-exempt and the loan officers were then entitled to overtime compensation consistent with the FLSA.[54] After they were reclassified as non-exempt, loan officers were required to record the hours they worked on time sheets.[55]  They were expected to work a 40-hour work week only, and to meet their production goals within that 40-hour week.[56]  Loan officers were required to seek pre-approval from their site manager before they worked overtime.[57] Loan officers submitted their times sheets to their site or sales manager, who in turn submitted them to Human Resources.[58]  The non-exempt loan officers contend they were required to work more than 40 hours per week but that they were forced to record only 40 hours on their weekly time sheets.

Because the class conditionally certified by the Court temporally spans from February 2, 2001 through August 24, 2004,[59] it includes loan officers who were classified as both exempt and non-exempt.[60]   Based on the Court's review of the evidence presented, the Court is persuaded that the loan officers who were classified as

---

[54]  See id.

[55]  See id.

[56]  See id.

[57]  See id., Response to Interrogatory #5.  Despite the written policy, loan officers in Greenville apparently were not required to obtain pre-approval. See Deposition of Kelton Graham, pages 49, 125-26.

[58]   See Doc. 103, Exhibit C (Defendant's Response to Lyndon Hart's First Set Of Interrogatories), Response to Interrogatory #5.

[59]  August 24, 2004 was the last date that any Plaintiff or opt-in Plaintiff worked for Oak Street.  See Doc. 134, Exhibit C to Declaration of Dena Brawner.

[60]  Based on the records submitted by Oak Street, no Plaintiffs and ten opt-in Plaintiffs were classified solely as exempt, four Plaintiffs and fifteen opt-in Plaintiffs were classified as non-exempt and one Plaintiff and thirteen opt-in Plaintiffs were classified as both exempt and non-exempt.  See id.

exempt are similarly situated with respect to their overtime claims, while the loan officers who were classified as non-exempt are not similarly situated *with* respect to their overtime claims.  The Court will discuss each category in turn.

The Court is persuaded that the claims of the one Plaintiff[61] (as it concerns his overtime claims *prior* to the reclassification of loan officers as non-exempt) and the claims of the opt-in Plaintiffs who were classified as exempt are similarly situated with respect to job requirements and pay provisions and that the basis of their claims is sufficiently similar for their claims to proceed collectively.[62]   That they worked in three different branch offices in two states is not conclusive as to the similarly situated inquiry.[63]  As discussed above, the Plaintiff and opt-in Plaintiffs shared the same job title, job description and job functions.  While there is some dispute as to the amount of discretion exercised by loan officers, there is no evidence that the amount of discretion varied significantly from loan officer to loan officer or that it varied by office.  The Plaintiff and opt-in Plaintiffs shared similar production requirements, were subject to the same evaluation process and were paid according to similar compensation plans.  Additionally, while office hours varied by branch and loan officer, the Plaintiff and opt-in Plaintiffs were uniformly required to work evenings and weekends.

_____

[61] The only Plaintiff who has a claim for unpaid overtime while he was classified as exempt is Joseph Bucks.

[62] See Dybach v. State of Fla. Dept. of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991).  Because the Greenville office did not open until August 2003, none of the Plaintiffs or opt-in Plaintiffs from that office were classified as exempt. Accordingly, the discussion in this section is limited to the Ocala, St. Petersburg and Atlanta branch offices.

[63] See Hipp v. Liberty National Life Insur. Co., 252 F.3d 1208, 1219 (11th Cir. 2001)(noting fact that plaintiffs worked in different geographical locations was not conclusive because the plaintiffs in Grayson worked in several states and the Court still held that they were similarly situated.)

Oak Street argues that it intends to raise an exemption defense that will turn on individualized factual and legal issues.[64]  Oak Street has failed to identify which specific exemption defense it intends to raise;[65] however, it argues that its exemption defense will turn on the job duties performed on a day-to-day basis, the level of discretion or responsibility given to the loan officer by his or her manager and how the manager applied general policies and procedures to the loan officer and the office in general.[66] Based on the Court's determination that the Plaintiff and opt-in Plaintiffs, who were classified as exempt, are similarly situated, the exemption defense can be addressed collectively.[67] Indeed, one of the common issues relevant to the overtime claims of each of the exempt loan officers is the legal determination of whether it was appropriate to classify loan officers as exempt from the requirements of the FLSA because of their job duties and responsibilities. While Oak Street argues that this inquiry is individualized for each Plaintiff, the evidence presented suggests that the loan officers in the three relevant offices performed virtually the same jobs with similar responsibilities. A

---

[64] Oak Street also contends that it will: (1) contest when an individual Plaintiff or an individual opt-in Plaintiff worked off-the-clock; (2) contest whether an individual Plaintiff or an individual opt-in Plaintiff actually worked forty hours in any given week; (3) show each manager did not know about off-the-clock work; (4) show that the individual Plaintiffs and the individual opt-in Plaintiffs did not take advantage of Oak Street's system of reporting time; (5) show that any off-the-clock work falls within the *de minimis* exception to the FLSA; and (6) show that each manager acted in good faith and that liquidated damages are inappropriate.  It appears as though these defenses are applicable to the non-exempt Plaintiffs and opt-in Plaintiffs.

[65] In its Amended Answer, Oak Street asserts as an affirmative defense that "29 USC Section 213(a)(1) provides that employees in a bona fide executive, administrative, or professional capacity are exempt from, among other things, the overtime compensation provisions of the FLSA.  Some or all of the Plaintiffs' overtime compensation claims are precluded because they were 'exempt' employees." Doc. 101, page 7.

[66] See Doc. 121, page 8.

[67] See Bradford v. Bed Bath & Beyond, Inc., 184 F.Supp.2d 1342, 1351 (N.D. Ga. 2002).

determination by the Court that the loan offices were exempt from the overtime provisions of the FLSA would be common to the claims of all opt-in Plaintiffs and, therefore, permitting these claims to proceed collectively would serve to promote judicial economy and efficiency.

However, with regard to the claims of those Plaintiffs and opt-in Plaintiffs who were classified as non-exempt, resolution of their claims would involve an individualized level of inquiry of the claim of the particular plaintiff. For example, the determination of each Plaintiff's claim will involve an individualized inquiry as to whether the particular Plaintiff requested permission from the site manager at the branch to work overtime and/or was directed by the site manager to work overtime and, if so, whether a plaintiff was instructed to record or not to record overtime on their time sheets.  This inquiry varies from branch to branch and may differ from plaintiff to plaintiff. This individualized inquiry is not present in the claims of exempt loan officers, who were not required to maintain or submit time sheets in view of the fact that they were not paid on an hourly basis.

 Plaintiffs contend that the non-exempt loan officers are similarly situated because there was a corporate policy of discouraging overtime.  However, even assuming that Oak Street had a corporate policy of discouraging overtime, each Plaintiff and opt-in Plaintiff's proof of a violation will be individualized because it depends upon

how or whether each individual manager implemented the policy with regard to each individual plaintiff.[68]

This is underscored by the testimony of the non-exempt Plaintiffs and opt-in Plaintiffs who already have been deposed in this case.  Plaintiffs have attempted to generalize the testimony by stating that each loan officer confirmed the "existence of this illegal policy and practice."[69]   However, the testimony is quite varied.  Some of the loan officers testified that they were told only to record forty hours because Oak Street would not pay overtime.[70]  Other loan officers testified that their time sheets were returned if they reflected more than 40 hours,[71] and one loan officer testified that his

---

[68] See Johnson v. TGF Precision Haircutters, Inc., 2005 WL 1994286, *4 (S.D. Tex. 2005)(decertifying the class upon finding inter alia that although there is evidence suggesting an "overarching" policy of wrongfully denying overtime pay, the alleged violations are highly variable, evidently depending upon circumstances and attitudes and perceptions of individual managers).

[69] See Doc. 125, ¶45 & n. 12.  Plaintiffs cite Scott v. Aetna Services, Inc., 210 F.R.D. 261, 265 (D. Conn. 2002) for the proposition that a case should proceed collectively despite differences among the situations of the putative class members where the defendant's failure to pay overtime "is common to all of the members of the proposed class and dominates each of their claims."

[70] See e.g., Deposition of Joseph Michael Bucks, Sr., pages 66-67 (testifying that sales manager in St. Petersburg, Steve Kleinrichert, directed him to "put 8's across the board.") Deposition of Rodney Rivers, Jr., pages 31(testified that Greenville sales manager, Jody Phillips, told him to put down 8 hours per day regardless of what hours he actually worked ); Deposition of John Brooks, pages 61-62,85 (testified that the Ocala site manager, Joe Gregoire, told him that he could not submit timesheet with more than 40 hours no matter how many hours he worked, and that successful loan officers always worked more than 40 hours a week); Deposition of James E. Perry, Jr., pages 63, 90-91, 93 (testifying that Dietz and Greenville sales manager, Jody Phillips, told him that Oak Street would not be paying overtime and the loan officers needed to find a way to get the job done during 40 hours); Deposition of Jawana L. Morris, pages 44-45, 71-72 (testifying that sales manager, Todd Warren in Atlanta advised that Oak Street does not pay overtime); Deposition of Lyndon G. Hart, pages 59-61, 83 (testified that Atlanta site manager, Mike Thimsen and sales manager, Jim Merchen told him that loan officers only got paid for 40 hours and that loan officers need to hit 10/2 no matter how many overtime hours worked); Deposition of Rodney Epps, pages 19-20, 22, 84-85)(testifying that Ocala site manager, Joseph Gregoire told him that Oak Street did not pay overtime and that he told loan officers that if they could not comply with policy of only recording 40 hours per week that "this may not be the place for you").

[71] See Deposition of Jawana L. Morris, pages 44-45, 71-72 (testifying that supervisors in Atlanta -- Mike Thimsen, Garrett Cooper, Todd Warren, Tyrone Bell and Jody Phillips -- would return the time sheets with more than 40 hours because they could not be submitted to human resources that way); Deposition of

(continued…)

time sheet was changed by the site manager to reflect only 40 hours.[72]  Two loan

officers testified that although they were never told not to record forty hours, they did not

record more than forty hours because they did not believe that Oak Street would pay

overtime or they thought there was an implied policy to deny overtime.[73]   Moreover,

Plaintiffs and opt-in Plaintiffs from each of the four branch offices reported and were

paid overtime during at least one pay period.[74]

Testimony varied among loan officers from the same branch office.  By way of

example, the two St. Petersburg loan officers, who have been deposed, testified very

differently.  Joseph Bucks testified that his sales manager told him to "put 8's across the

board,"[75] while Martin Toth testified that he was never told not to record more than 40

hours, but that it was implied that Oak Street would not pay overtime.[76]  Additionally,

Martin Toth (and three other loan officers in the St. Petersburg branch office) reported

and were paid overtime.

---

[71](...continued)
Lyndon G. Hart, pages 60-61 (testifying that Jim Merchen returned his time sheet showing more than 40 hours and showed him how to fill it out putting only 40 hours).

[72] See Deposition of Rodney Epps, pages 23-25, 83-84 (testified that the Ocala site manager, Joseph Gregoire, changed his timesheets that reflected overtime and reduced them to 40 hours).

[73] See Deposition of Lisa Terrell, pages 140-42 (testifying that she did not record overtime hours because she did not believe Oak Street would pay for more than 40 hours, however, noone told her that); Deposition of Martin Toth, page 88-89 (testifying that there was an implied policy that Oak Street would not pay him for any overtime he worked).

[74] See Doc. 134, Exhibit D to Declaration of Dena Brawner.  Steven Hairston, Jawana Morris, Dwayne Redding and Anthony Webb reported and were paid overtime in the Atlanta branch office;  Erwin Lopez, Martin Toth, William Reagan and Brandon Marsh reported and were paid overtime in the St. Petersburg branch office;  Diane Palmere reported and was paid overtime in the Ocala branch office; and James Perry reported and was paid overtime in the Greenville branch.

[75] See Deposition of Joseph Bucks, pages 66-67.

[76] See Doc. 134, Exhibit D to Declaration of Dena Brawner.

As such, whether each Plaintiff and opt-in Plaintiff was forced to record only forty hours will need to be determined on an individual basis.[77]  If it is determined that a manager in one of the branch offices forced a Plaintiff or opt-in Plaintiff not to record overtime, it will not necessarily establish liability as to the other loan officers in that same office or loan officers in the other three branch offices.[78]

This is further complicated by the various defenses that Oak Street is entitled to raise, which will require highly individualized evidence concerning each loan officer. Oak Street states that at a minimum it will: (a) contest when a Plaintiff or opt-in Plaintiff worked off-the-clock; (b) contest whether a Plaintiff or opt-in Plaintiff actually worked forty hours in any given week; (c) show each manager did not know about off-the-clock work; (d) show that the Plaintiffs or opt-in Plaintiffs did not take advantage of Oak Street's system for reporting time; (e) show that any off-the-clock work falls within the *de minimis* exception to the FLSA; and (f) show that each manager acted in good faith and that liquidated damages are inappropriate.[79]  Accordingly, because the claims of the Plaintiffs and opt-in Plaintiffs, who were classified as non-exempt, are individualized and not similar, their claims should not proceed collectively.[80]

---

[77] For the same reasons, the Court declined to create two subclasses -- i.e., exempt and non-exempt loan officers.

[78]  This is further exacerbated by the fact that none of the named Plaintiffs worked in the Greenville branch office.

[79] See Basco v. Wal-Mart Stores, Inc., 2004 WL 1497709, *8 (E.D. La.)(finding that the identical defenses "heighten[ed] the individuality of the claims and complicate[ed] the significant management problems.")

[80] Plaintiffs contend that the Court's ruling will not have any preclusive effect on *Vaughn*.  Oak Street did not address the merits of this argument in its supplemental filing (Doc. 134), nor was it required to do so.  If Oak Street raises res judicata or collateral estoppel in the *Vaughn* action, the Court will address

(continued…)

In sum, Plaintiff Joseph Bucks (the only named Plaintiff who has claims for overtime while he was classified as exempt) and the opt-in Plaintiffs who were classified as exempt should proceed to trial collectively in this action.   However, the conditional class should be decertified to the extent that the opt-in Plaintiffs, who were classified as non-exempt, should be dismissed without prejudice to the right of each opt-in Plaintiff to file a suit on his or her own behalf.   As for the opt-in Plaintiffs who were classified as both exempt and non-exempt, their claims relating to the period when they were classified as exempt should proceed in this case collectively. However, their claims relating to the period when they were classified as non-exempt should be dismissed without prejudice to the right of each opt-in Plaintiff to pursue suit on these claims individually.  To avoid prejudice to the opt-in Plaintiffs, the District Court should withhold entry of final judgment so that each individual plaintiff who wishes to proceed with an individual claim can file suit in this district, or within another appropriate District, within thirty days of the District Court's Order.  For those opt-in Plaintiffs who file suit in this District, the Court can then transfer any individual cases to the appropriate district court pursuant to 28 U.S.C. §1406 and §1631.

### C.      Nationwide Certification

As discussed above, the Court previously declined to grant nationwide conditional certification but rather, limited conditional certification to four of the branch offices located in the Southeast/Dietz region.  To the extent the Plaintiffs are requesting

---

[80](…continued)
such an argument then.

nationwide certification, their request should be denied.[81]  As an initial matter, based on the Court's conclusion that only the Plaintiff and opt-in Plaintiffs who were classified as exempt should be permitted to proceed collectively, the Court will consider nationwide certification only with respect to loan officers who worked for Oak Street prior to January 2003.

Plaintiffs filed a Supplemental Memorandum to which they attached sworn affidavits from forty-nine *Vaughn* plaintiffs and opt-ins who worked in eighteen of Oak Street's thirty branch offices nationwide. Although the affidavits varied, the loan officers attested that Oak Street maintained performance goals that required loan officers to work well over 40 hours a week, that Oak Street's management style was based almost entirely upon motivation by threat of termination, that they were constantly being reminded that failure to reach the required sales quotas would result in termination, that loan officers were constantly being put on probation and terminated for failure to meet the sales quotas, and that they were not compensated for the hours they worked in excess of 40 hours per week.[82]

Plaintiffs contend that these affidavits show that the challenged overtime practices predominate throughout the other branch offices and regions.  However, only sixteen of the affiants appear to have worked for Oak Street prior to 2003.[83]  These

---

[81] During the relevant time period, Oak Street had 30 branch offices and employed approximately 1,648 loan officers.

[82] See Doc. 133, Exhibit D.

[83] According to their affidavits, Andrew Pahopin worked in Fort Myers, Florida; Richard Corrao, Michael Decker, Edward Furbee, Richard Medcalf and Eric Waggoner worked in Jacksonville, Florida; Joe Santiago worked in Maitland, Florida; Rafael Rodriquez worked in Orlando, Florida; Mini Singh in St.

(continued...)

sixteen affiants worked in nine of Oak Street's branch offices; which means that Plaintiffs have offered, at most, evidence from ten of Oak Street's thirty branch offices that Oak Street wrongfully failed to pay overtime prior to 2003.[84]  Moreover, they have failed to provide any evidence from at least two of the six regions regarding overtime violations prior to 2003.[85]  As such, Plaintiffs have failed to present evidence that the challenged overtime practices predominate throughout the other branches and regions.

Moreover, Plaintiffs have failed to offer any evidence that they are similarly situated to potential opt-in Plaintiffs from branch offices located in regions other than the Southeast/Dietz region.   While the above affidavits may have been sufficient at the "fairly lenient" stage one, they are clearly insufficient at this second stage of the similarly situated inquiry.  Accordingly, to the extent the Plaintiffs are requesting nationwide certification, their request should be denied.

---

[83](...continued)
Petersburg, Florida.  One affiant --Amber Muhammad -- worked in Atlanta, Georgia.  Only five affiants worked in branch offices outside of the southeast -- Antoniette Roberts worked in Chesapeake, Virginia; Maryann Melcer and Donna Underhill in Virginia Beach, Virginia; and Brian Hannon, Camille Philopovitch and Darren Strunk worked in Scottsdale, Arizona.

[84] One of the affiants stated that he worked in the Maitland, Florida branch, however, there is some evidence suggesting that he actually worked in the Orlando branch.  See Doc. 134, Exhibit C to the Declaration of Dena Brawner.  Likewise, one of the affiants stated that she worked in the Chesapeake, Virginia branch, however, there is evidence suggesting that she actually worked in the Virginia Beach, Virginia branch.  See id.  If so, this would reduce the number of branch offices for which Plaintiffs provided evidence from ten to eight.

[85] See Doc. 134, Exhibit C to Declaration of Dena Brawner.  Seven of the affiants worked in Jacksonville, St. Petersburg and Atlanta, which were in the Dietz/Southeast region.  Three  affiants worked in Maitland/Orlando and Fort Myers, which were in the Cowan/Southeast region.  Three affiants worked in Chesapeake/Virginia Beach, which was in the Northeast region and three worked in Scottsdale, Arizona which was in the West region.  None of the affiants who worked prior to 2003 in branch offices located in either the Midwest or Great Western/Southwest regions.

## IV.  **RECOMMENDATION**

In view of the foregoing, it is respectfully **RECOMMENDED** that:

(1) Defendant's Motion For Decertification (Doc. 103) be **GRANTED** with regard to the claims of any plaintiffs[86] or opt-in plaintiffs for time worked after they were classified as exempt in January  2003 and in all other respects Defendant's Motion For Decertification should be **DENIED**;

(2) The District Court should dismiss without prejudice the claims of the opt-in Plaintiffs who were not classified as exempt[87];

(3) The District Court should withhold entry of final judgment so that each individual plaintiff who wishes to proceed with an individual claim can file a suit in this district or the appropriate district.  The Court should then transfer any individual cases re-filed in this District to the appropriate district court pursuant to 28 U.S.C. §1406 and §1631.

---

[86] All of the claims of Plaintiffs John Brooks, Rodney Epps, Lyndon Hart and Jawana Morris relate to overtime while they were non-exempt. Accordingly, these claims should not proceed as part of the collective action. Furthermore, the claims of Lyndon Hart and Jawana Morris relate to the Atlanta office and therefore do not have any nexus to this district or the Ocala Division. Accordingly, these claims should be transferred to the Northern District of Georgia where the events occurred and presumably where most of the witnesses are located. With regard to the claims of John Brooks and Rodney Epps, both of whom worked in the Ocala office, these claims can proceed in this action, although trial of the claims should proceed separately from the collective action.

[87] The claims to be dismissed include: (1) all of the claims of opt-in Plaintiffs Sonya Carter, Valerie Durham, Gettis Fowler, Steven Hairston, Kyle Jackson, Cerrento Jones, Diana Kirchman, Brandon Marsh, Daniel Martin, James Perry, Anthony Raymond, Dwayne Redding, Rodney Rivers, Ronnie Wilkins, and Lynn Woods, and (2) those portions of the claims for overtime during their classification as non-exempt of opt-in plaintiffs Troy Bossert, Nicholas Brencheck, Debra Hawkins, Gerald Lewis, Erwin Lopez, Sean McClellan, Jason Nieuwenhuis, Charles Northington, Diane Palmere and William Reagan.

(4) To the extent Plaintiffs have requested nationwide certification, that request

should be **DENIED**.

**IN CHAMBERS** in Ocala, Florida, on November 14, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record